IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| UNITED STATES OF AMERICA | HON. JEROME B. SIMANDLE |
| v. | Criminal No. 14-699-1 (JBS) |
| TOYE TUTIS, | **OPINION** |
| Defendant. | |

APPEARANCES:

> Craig Carpenito, United States Attorney
> By: Diana Carrig, Assistant U.S. Attorney
> 401 Market Street, 4th Floor
> P.O. Box 2098
> Camden, NJ 08101-2098
>
> Stanley O. King, Esq.
> King & King, LLC
> 231 Broad Street
> Woodbury, NJ 08096
>     Attorney for Defendant

**SIMANDLE, District Judge:**

## I.  INTRODUCTION

The Defendants, Toye Tutis and Jazmin Vega, are charged in a Second Superseding Indictment (filed September 14, 2016) with various offenses related to the distribution of drugs and money laundering in the Atlantic City, New Jersey area.

Presently before the Court is the motion of Defendant Tutis to suppress evidence obtained as a result of a court-authorized wiretap of Defendant Tutis' cell phone approved by a New Jersey

state court judge on September 26, 2014. (See Omnibus Motion of Toye Tutis (hereinafter "Def.'s Renewed Mot.") [Docket Item 322].)[1] This motion rests on three principal grounds.

First, the defense argues that the September 26, 2014 Order authorized an unlawful roving wiretap of any telephone Tutis may come to use and thus was a general warrant.

Second, Defendant Tutis alleges that the wiretap order, obtained by an Atlantic County Prosecutor's Office ("ACPO") Detective was based on false information about Toye Tutis' involvement, as well as material omissions, which the detective knowingly, intentionally, and/or recklessly made in his affidavit; accordingly, Defendant Tutis sought a hearing under Franks v. Delaware, 438 U.S. 154 (1978).[2] This Court convened a Franks hearing on October 17, 2016, and the evidence obtained will be discussed herein.

---

[1] Defendant Vega appears to join in Defendant Tutis' present motion; counsel for Defendant Vega engaged in a brief cross examination of Detective Dorn during the Franks hearing described, supra, but did not provide any briefing or oral argument regarding the motion. (See 10/17/16 Tr. [Docket Item 414], 175:7-176:23.)

[2] The Court previously had denied prior counsel's motion for a Franks hearing because Defendant made an insufficient showing that Detective Dorn, the affiant, acted knowingly, intentionally, or recklessly in presenting an affidavit with false information. United States v. Tutis, 2016 WL 885044 at *11 (D.N.J. Mar. 8, 2016) [Docket Item 264]. This renewal of that motion was accompanied by the Declaration of Toye Tutis and further information developed in recent months, discussed below. For reasons expressed at a hearing on October 13, 2016, the Court agreed that a Franks hearing should be convened.

Third, Defendant Tutis argues that the Government is barred from using evidence collected as a result of the September 26, 2014 Order, because such evidence was collected by state authorities in violation of the Fourth Amendment, and therefore is subject to the "Silver Platter" Doctrine, and must be excluded from trial under Elkins v. United States, 364 U.S. 206 (1960).[3]

The Court previously filed an Order on October 21, 2016 [Docket Item 388] denying "Defendant Toye Tutis' motion to suppress

---

[3] Defendant Tutis also argues that the Court should suppress evidence obtained by electronic surveillance and/or consensual electronic interceptions of Defendant Ivan Cuellar Naranjo where such communications involved Defendant Tutis. Because the Court has found that Judge DeLury had a substantial basis for authorizing the Tutis wiretaps, which also intercepted the same conversations the Government intends to use at trial, the basis for this suppression motion is moot.

Additionally, due to the complex nature of this case's history, the Court may not previously have issued a ruling with regard to, Defendant Tutis' contention that the ACPO used a special technology "which transforms an ordinary cell phone into a bug," and that it would have needed, but did not obtain, authorization to use such technology. (Def. Br. at 36.) In support of this assertion, Tutis refers to a "Friday Report" dated October 3, 2014, which advised Judge DeLury that the actual conversations intercepted included background conversations and traditional telephone conversations. (Def. Br. at 36). The Government argues in response that "there is utterly no evidence that law enforcement used such technology." (Opp'n at 13). The Court agrees. Moreover, in response to the Court's inquiry at the Sept. 8, 2016 hearings [Sept. 8, 2016 Tr. at 51: 14-19], the Government reconfirmed that the CSS was not used to turn another device into an eavesdropping device or "bug," and that no such evidence was obtained in this case other than duly authorized wiretapped conversations and consensually recorded conversations. [Id. at 52: 1-6.] Without further evidence that the Government used a roving bug in this case, the Court cannot consider suppression of any evidence.

evidence intercepted as a result of the September 26, 2014 Wiretap Order," including Defendant Tutis' <u>Franks v. Delaware</u> motion. The present Opinion memorializes the Court's reasons for that Order.[4]

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  General Case and Investigation Background

The charges contained in the Indictment stem from a long-running investigation conducted jointly by federal, state, and local law enforcement officers, targeting an alleged drug-trafficking organization in Atlantic City and the surrounding southern New Jersey region. (<u>See</u> Walsh Aff. at ¶¶ 5-6.)[5] The fruits of this investigation purportedly revealed, overall, that Defendant Tutis sourced supplies of heroin and cocaine from the Mexican Sinaloa cartel (with the help of alleged cartel broker, Defendant Ivan Cuellar Naranjo), through contacts in Los Angeles, California, and relied upon his network of alleged drug-traffickers in this region (namely, Defendants Tozine Tiller, Jewell Tutis, and Atiba, among others) to distribute and sell the

---

[4] The present Opinion amplifies and explains the Court's October 21, 2016 denials of these motions and is entered pursuant to L.A.R. 3.1, which gives the trial court an opportunity, for 30 days after the notice of appeal is filed, to explain a prior ruling that is a subject of the appeal.

[5] An affidavit of FBI Special Agent Timothy M. Walsh was submitted as Exhibit 1 to the Government's opposition brief to Defendant Tutis' first Motion to Suppress [Docket Item 234]. Neither the Government's opposition to that motion, nor the exhibits thereto were filed on the docket.

drug products. (See id. at ¶¶ 6-7.) Defendant Tutis, with his wife Defendant Jazmin Vega, then allegedly "launder[ed]" the proceeds of this drug conspiracy through cash deposits into various bank accounts, high-end purchases, and by comingling the drug-trafficking proceedings with the proceeds of his legitimate business (namely, Ta'Ja Construction, LLC, Ta'Ja Construction I, LLC, Real Estate Investors, LLC, Ta'Ja Laundromat, Dave's Grocery, and Integrity Heating & Cooling, LLC). (Id. at ¶¶ 7-9.)

During the course of the investigation, state and federal law enforcement officials learned of the nature of the alleged drug-trafficking conspiracy through a series of drug purchases (namely, controlled buys by confidential sources), package intercepts, trash pulls, authorized property searches and seizures, as well as court authorized "roving wiretaps" of telephones known to be used by various defendants. (Id. at ¶¶ 10-11.) Indeed, the genesis of the electronic-surveillance aspect of this case dates back to an initial federal wiretap obtained on November 21, 2013, and supported by a probable cause affidavit that identified a number of "'target interceptees,'" including Tozine Tiller and Toye Tutis.[6] (Brief in Support of Tutis' First Motion to Suppress (hereinafter, "First Tutis Br.") [Docket Item 234], 1-2; see also

---

[6] Defendants mount no challenge to the propriety of the various federal wiretaps.

Gov't Opp'n to Tutis' First Motion to Suppress (hereinafter, "Gov't First Opp'n") at 6.)

## B. State Wiretap Authorizations

As relevant here, the Atlantic County Prosecutor's Office (hereinafter, the "ACPO") obtained a series of wiretaps, authorized by the Honorable Bernard E. DeLury (hereinafter, "Judge DeLury") and supported by the affidavits of Detective Jason E. Dorn (hereinafter, "Detective Dorn"), on cellular telephones known to be used by Defendants Jewell Tutis, Toye Tutis, and Ivan Cuellar Naranjo. (See Gov't First Opp'n at 7; see also Dorn Sept. 19, 2014 Aff. (Ex. 2 to Gov't First Opp'n); Dorn Sept. 26, 2014 Aff. (Ex. 3 to Gov't First Opp'n).)

On September 19, 2014, the ACPO obtained its first "roving" wiretap authorization (BED-ATL-21-WT-2014) to intercept communications over the cellular telephone of Jewell Tutis (609-626-4283) (hereinafter, the "Jewell wiretap"). (See Ex. 2 to Gov't First Opp'n.) In support of this initial authorization, Detective Dorn informed Judge DeLury of the federal wiretaps targeted at Toye Tutis (among other investigative techniques used in relation to Defendant Tutis) and explained that an ongoing investigation into Toye Tutis had identified Jewell E. Tutis as "an operator/partner of an ongoing criminal narcotics distribution organization." (Dorn Sept. 19, 2014 Aff. at ¶¶ 11, 19.) More specifically, the affidavit stated that a confidential informant

(hereinafter, "CI #607/CS-2")[7] had a conversation with Toye Tutis in July 2014, during which time Tutis advised CI #607/CS-2 that he could supply the individual with cocaine, marijuana, and heroin in an array of quantities. (Id. at ¶ 21.) Toye then purportedly instructed CI #607/CS-2 to refer to him as "'Santana'" over the telephone and provided CI #607/CS-2 with "a series of code phrases"[8] to use when contacting his brother, Jewell, to purchase drugs. (Id.) CI #607/CS-2, in turn, met with Jewell, who reiterated that he and his brother, Toye, could provide narcotics, and other "'hardware.'" (Id. at ¶ 22.)

Following these initial exchanges, on August 5, 2014, Detective Dorn met with CI #607/CS-2 at a predetermined location "to place a recorded telephone call to Toye Tutis." (Id. at ¶ 23.) At that time, CI #607/CS-2 handed Detective Dorn a Ta'Ja Construction Real Estate Investor's LLC "business card" he claimed

---

[7] The ACPO materials refer to this confidential source as CI #607, while the Government identified the same confidential source as CS-2. (See Gov't First Opp'n at 12 n.8.) In order to avoid any ambiguity, this Court will refer to the confidential informant by both identifiers.

[8] These phrases and their claimed meanings included: (1) "'come to work early,'" which meant that the confidential source needed additional drugs; (2) "'bring me a cup of coffee in the morning,'" which indicated that the informant needed marijuana, (3) "'[b]ring me a box of doughnuts in the morning,'" which meant that the source wanted an ounce of cocaine, and (4) a "whole 'bird,'" which indicated that the informant desired a kilogram of cocaine. (Dorn Sept. 19, 2014 Aff. at ¶ 21.)

to have received from Defendant Tutis on August 4, 2014,[9] and on which someone had handwritten (on the back) "the name 'Jewel' and a telephone number of (609)626-4684, and the name 'Santana' with a telephone number of (609)431-2044."[10] (Id.; see also Ex. 4 to Gov't First Opp'n.)[11] In the presence of Detective Dorn, the confidential informant then dialed the number for "'Santana,'" 609-431-2044, and requested "'a box of doughnuts'" (i.e., an ounce of cocaine). (Dorn Sept. 19, 2014 Aff. at ¶ 23.) A voice which Detective Dorn recognized as the voice of Toye Tutis instructed CI #607/CS-2 to "call [his] brother."[12] (Id.) CI #607/CS-2, in turn, placed a call to the number for "'Jewel,'" 609-626-4684, again in the presence of Detective Dorn, and requested a "'box of doughnuts.'" (Id.) The following day, August 6, 2014, CI #607/CS-2 met with Jewell Tutis (i.e., Defendant Tutis' brother) and

---

[9] The business card itself provides, on its face, only the contact information for "Toye." (Ex. 4 to Gov't First Opp'n.)

[10] The affidavit provides no detail concerning the source of the writing on the business card. On the oral argument record, however, the Government explained that CI #607/CS-2 revealed, during a subsequent interview, that the source had inscribed the contact information on the business card.

[11] The business card itself does not specifically disclose the area code associated with these telephone numbers, but no party takes issue with Detective Dorn's inclusion of "609," the area code that, in any event, prevails in Atlantic City, New Jersey.

[12] In latter portions of his affidavit, Detective Dorn claimed that he had familiarity with the voice of Toye Tutis, as explained below. (See Dorn Sept. 26, 2014 Aff. at ¶ 54.)

completed the first in a lengthy series of controlled drug purchases. (Id. at ¶ 24)

Aside from these early encounters, Detective Dorn detailed and recounted the additional drug involvement evidence against Jewell Tutis as provided by the confidential informant through subsequent recorded conversations,[13] and through additional controlled purchases. (See id. at ¶¶ 11, 20-48.) Indeed, the affidavit documents no fewer than nine completed drug transactions between CI #607/CS-2 and Jewell Tutis, all of which the ACPO affirmatively identified as drug substances through field tests.[14] (See, e.g., id. at ¶¶ 26, 28, 30, 34, 36, 39, 41, 44, 47, 52.)

As a result, Detective Dorn expressed his opinion that the evidence gathered at that time demonstrated probable cause that Jewell E. Tutis utilized the cellular device to communicate between co-conspirators in furtherance of an illicit narcotics distribution conspiracy, and that an electronic interception of the communications would enable the state investigators to (1) understand the nature of Jewell Tutis' relationship with his co-conspirators, (2) identify the suppliers of the controlled

---

[13] These recorded conversations include a number of calls to Jewell Tutis, related to purchases of drugs, fraudulent drivers' licenses, and firearms. (See Dorn Sept. 19, 2014 Aff. at ¶¶ 24-53.)

[14] The Government claims that these controlled buys totaled "29 ounces of crack cocaine and 10 pounds of marijuana" from August 6, 2014 through September 30, 2014. (Gov't First Opp'n at 16.)

substances, and (3) determine the location(s) of the drug substances and their proceeds.[15] (See id. at ¶¶ 49-50.)

After a few days of intercepting communications pursuant to the Jewell wiretap, Detective Dorn (and others) determined that Toye Tutis had used a specific cellular telephone in connection with his alleged drug distribution, 424-646-1761. (See Dorn Sept. 26, 2014 Aff. at ¶¶ 3-5.) As in the affidavit submitted in connection with the Jewell wiretap,[16] Detective Dorn acknowledged the wide scope of the investigation into Toye Tutis' drug activity, as well as the use of federal wiretaps that identified Toye Tutis as the target interceptee. (See id. at ¶ 11.) Nevertheless, Detective Dorn explained that the probable cause for "the present wiretap application" stemmed only from his state-based

---

[15] Judge DeLury authorized two extensions of this original wiretap authorization (BED-ATL-21-WT-2014X (October 9, 2014) and BED-ATL-21-WT-2014XX (October 17, 2014)), and on October 27, 2014, authorized a wiretap order designating Jewell Tutis as a leader of a drug trafficking organization. (See Gov't First Opp'n at 8.) In sum, these electronic interceptions began on or about September 22, 2014 and continued through on or about November 24, 2014. (See id.)

[16] The second affidavit of Detective Dorn restates and builds upon the evidence and information described in his first affidavit. (Compare Dorn Sept. 19, 2014 Aff., with Dorn Sept. 26, 2014 Aff.) In other words, in seeking the wiretap authorization against Toye Tutis, the ACPO continued to rely upon the confidential informant's statements concerning the initial meeting with Defendant Tutis in July 2014, as well as the contents of the recorded telephone call on August 5, 2014, and the subsequently completed drug transactions. (See Dorn Sept. 26, 2014 Aff. at ¶¶ 21, 23.)

investigations,[17] including the evidence recited in the affidavit supporting the Jewell wiretap, together with the fact that the Jewell wiretap had captured conversations and text messages between Jewell and Toye allegedly concerning their attempts to obtain fraudulent drivers' licenses (and that supposedly confirmed Toye Tutis as the owner of the cellular telephone).[18] (See id. at ¶¶ 54-55; see also Ex. A to Dorn Sept. 26, 2014 Aff. (line sheets of recorded telephone calls concerning fraudulent drivers' licenses).)

As a result, Detective Dorn again expressed his belief that the evidence gathered at that time demonstrated probable cause

_____

[17] In other words, Detective Dorn specifically declined to detail the fruits, if any, of the federal investigation, given the somewhat greater latitude afforded federal law enforcement in conducting investigations.

[18] As noted by Defendant Toye Tutis, these conversations did not, at least on the surface, delve into the acquisition of illegal narcotics, nor did they make mention of any controlled sales to the confidential informant (i.e., CI #607/CS-2). (See First Tutis Br. [Docket Item 234], 5; see also Ex. A to Dorn Sept. 26, 2014 Aff.) Rather, in the conversations most cited by the parties (i.e., call sessions 131 & 138 on September 24, 2014), a person believed to be Toye Tutis referenced the purchase of fraudulent California drivers' licenses for Jewell Tutis, and then stated that "' all [they] need[ed] to do [was] go in and open up boxes.'" (Dorn Sept. 26, 2014 Aff. at ¶ 54.) Despite the brevity of these exchanges, Detective Dorn explained how drug traffickers, in his experience, "utilize fraudulent out-of-state driver[s'] licenses to retrieve packages of suspected contraband through the United States mail." (Id.) In that way, the affidavit of Detective Dorn plainly connects the conversation concerning fraudulent drivers' licenses to the overall allegations concerning Toye Tutis' alleged role in a drug trafficking operation.

that Toye Tutis continued to be involved in the sale of controlled dangerous substances, and that an electronic interception of the communications of his identified cellular device would enable the state investigators to (1) further understand the nature of Tutis' relationship with his co-conspirators, (2) identify the suppliers of the controlled substances, and (3) determine the location(s) of the drug substances and their proceeds. (See id. at ¶¶ 56-58.) In view of the contents of the affidavit, Judge DeLury issued the requested wiretap on September 26, 2014 (BED-ATL-22-WT-14 & BED-ATL-153-CDW-14) (hereinafter, the "Toye wiretap").[19]

## C. December 9, 2014 Search Warrants, December 10, 2014 Indictment, and Arrests

On December 9, 2014, federal law enforcement agents obtained federal search warrants for approximately seven properties throughout southern New Jersey, all of which bore some claimed relation to the alleged drug trafficking organization. (See Gov't First Opp'n at 32; see also Walsh Aff. at ¶ 7.)

Then, on December 10, 2014, a federal grand jury returned a two-count Indictment charging certain defendants with conspiring to traffic in cocaine, heroin, and crack cocaine, and select others

---

[19] On the oral argument record with respect to Defendant Tutis' first motion to suppress, counsel for the Government raised the prospect that Judge DeLury may have questioned Detective Dorn on the contents of his affidavit in advance of his wiretap authorization. Nevertheless, the relevant record on the issue of suppression contains no support for this assertion, and so the Court has not considered it.

with conspiring to conceal and/or disguise the proceeds of this unlawful activity. (See generally [Docket Item 1].) More specifically, and as relevant here, the Indictment charges Defendants Tutis and Atiba with perpetrating a drug-trafficking conspiracy in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846 (hereinafter, "Count I"), and then charges Defendants Tutis and Vega with perpetrating a money-laundering conspiracy in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(1)(B)(i), (a)(1)(B)(ii), and (h) (hereinafter, "Count II").

During the execution of the search and arrest warrants, officers seized additional evidence of drug trafficking and money laundering, including more than one kilogram of crack cocaine, lesser amounts of powder cocaine and heroin, eight firearms, two tasers, more than forty cellular telephones, a bulletproof vest, and in excess of $100,000 in cash. (See Gov't First Opp'n at 32–33.)

**D. Defendant Tutis' First Motion to Suppress**

This Court, in its March 8, 2016 Opinion addressing Defendants' first set of pretrial motions, denied Defendant Tutis' motion to suppress the wire and electronic conversations captured under the September 26, 2014 wiretap because it found that Judge DeLury had a substantial basis to find that Detective Dorn's Affidavit, viewed in its entirety, demonstrated a "fair probability" of Toye Tutis' involvement in criminal activity. See

<u>Tutis</u>, 2016 WL 885044, [Docket Item 264], at *11. The undersigned also denied Defendant Tutis' request that the Court conduct a <u>Franks</u> hearing regarding omissions in Detective Dorn's September 26, 2014 Affidavit, because Defendant Tutis made no showing that Detective Dorn knowingly, intentionally, and/or recklessly made a false statement. <u>Id.</u> at *12.

### E. Defendant Tutis' Renewed Motion to Suppress

On July 29, 2016, Defendant Tutis, then represented by J. Michael Farrell, Esq., filed a second omnibus pretrial motion, including renewed requests to suppress the September 26, 2014 Wiretap Order and a renewed request for a <u>Franks</u> hearing. (<u>See</u> Def.'s Renewed Mot. [Docket Item 322], 7-31.)

The Court reconsidered its earlier decision denying a <u>Franks</u> hearing during hearings on September 27, 2016 and October 13, 2016, and a <u>Franks</u> hearing commenced on October 17, 2016. (<u>See</u> Order Concerning Various Pretrial Motions [Docket Item 377].) On October 21, 2016, after the conclusion of the <u>Franks</u> hearing, the Court filed an Order denying Defendant Tutis' renewed motion, [Docket Item 322], insofar as it sought to "suppress evidence intercepted as a result of the September 26, 2014 Wiretap Order." (Order [Docket Item 388].) The present Opinion sets forth the reasons for that denial.

## III. <u>STANDARD OF REVIEW</u>

### A. **Standard for Suppression**

The traditional Fourth Amendment principles that apply to property searches govern probable cause determinations under the federal and/or state wiretap statutes. See <u>United States v. Tehfe</u>, 722 F.2d 1114, 1118 (3d Cir. 1983); <u>see</u> <u>also</u> 18 U.S.C. § 2518(3) (federal wiretap statute); N.J.S.A. § 2A:156A-10 (state wiretap statute). Under these principles, a finding of probable cause requires a "'fair probability'" of criminal activity, based upon the totality of the circumstances. <u>United States v. Bond</u>, 581 F.3d 128, 139 (3d Cir. 2009) (quoting <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983)). Stated differently, the issuing court must "make a practical, common-sense decision" concerning whether the circumstances set forth in the supporting affidavit, "including the 'veracity' and 'basis of knowledge' of the persons supplying the hearsay information," demonstrate "a fair probability" that the authorization will result in evidence of a crime. <u>Id.</u> at 238-39.

A reviewing court must afford great deference to the probable cause finding of an issuing court. See <u>United States v. Hodge</u>, 246 F.3d 301, 305 (3d Cir. 2001); <u>United States v. Jones</u>, 994 F.2d 1051, 1055 (3d Cir. 1993). As a result, the probable cause determination of an issuing court will be upheld so long as the supporting documents provided a substantial basis for the initial

probable cause decision.[20] See Hodge, 246 F.3d at 305; Jones, 994

F.2d at 1055. This deferential standard "does not mean that

<hr />

[20] Title III of the Omnibus Crime Control and Safety Street Act of 1968 empowers a judge to enter an ex parte order to authorize interception of wire communications, if the judge determines on the basis of the facts submitted by the application that:

> (a) there is probable cause for belief that an individual is committing, has committed, or is about to commit [a drug-trafficking offense]; (b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception; (c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous; (d) except as provided in subsection (11), there is probable cause for belief that the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

18 U.S.C. §§ 2518(3)(a)-(d). The New Jersey Wiretapping and Electronic Surveillance Control Act, which governed the wiretap at issue here, contains analogous provisions, and specifically authorizes the issuance of a wiretap, if the judge finds probable cause to believe that:

> a. [t]he person whose communication is to be intercepted is engaging or was engaged over a period of time as a part of a continuing criminal activity or is committing, has or had committed or is about to commit an offense as provided in section 8 of P.L.1968, c.409 (C.2A:156A-8); b. [p]articular communications concerning such offense may be obtained through such interception; c. [n]ormal investigative procedures with respect to such offense have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous to employ; d.

reviewing courts should simply rubber stamp" the authorizing judge's conclusions," Tehfe, 722 F.2d at 1117 (citing United States v. Ventresca, 380 U.S. 102, 108 (1965)), but it does counsel that "resolution of doubtful or marginal cases . . . be largely determined by the preference . . . accorded to warrants." Jones, 994 F.2d at 1055 (citing Ventresca, 380 U.S. at 109). In other words, the standard encourages that slight doubts concerning the propriety of the wiretap authorization be resolved in favor of the issuing court. See generally id.

---

[e]xcept in the case of an application meeting the requirements of subsection g. of section 9 of P.L.1968, c.409 (C.2A:156A-9), the facilities from which, or the place where, the wire, electronic or oral communications are to be intercepted, are or have been used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by, such individual; e. [t]he investigative or law enforcement officers or agency to be authorized to intercept the wire, electronic or oral communication are qualified by training and experience to execute the interception sought; and f. [i]n the case of an application, other than a renewal or extension, for an order to intercept a communication of a person or on a facility which was the subject of a previous order authorizing interception, the application is based upon new evidence or information different from and in addition to the evidence or information offered to support the prior order, regardless of whether such evidence was derived from prior interceptions or from other sources.

N.J.S.A. § 2A:156A-10.

## B. Standard for Determining Whether a Warrant is an Unconstitutional General Warrant

The prohibition against general warrants stems directly from the text of the Fourth Amendment to the Constitution, which requires that all warrants describe "particularly . . . the place to be searched, and the persons or things to be seized." As interpreted by the Supreme Court, this language prohibits a "'general, exploratory rummaging in a person's belongings.'" Andresen v. Maryland, 427 U.S. 463, 480 (1976) (quoting Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971)). "The particularity requirement 'makes general searches . . . impossible and prevents the seizure of one thing under a warrant describing another.'" United States v. Christine, 687 F.2d 749, 752 (3d Cir.1982) (quoting Marron v. United States, 275 U.S. 192, 196 (1927)). On the other hand, "'no tenet of the Fourth Amendment prohibits a search merely because it cannot be performed with surgical precision.'" United States v. Conley, 4 F.3d 1200, 1208 (3d Cir. 1993) (quoting Christine, 687 F.2d at 760). The terms of a search warrant must be read in context and not in isolation, in order to determine whether the warrant is sufficiently specific. Id.

## IV. DISCUSSION

### A. The Wiretap Order Was Not a General Warrant

Tutis first claims that the evidence obtained from the state roving wiretap of his cell phone should be suppressed because the

September 26, 2014 wiretap order signed by Judge DeLury was an unconstitutional general warrant in that it authorized a tap of "up to five phones 24 hours a day, 7 days a week." (Reply Br. [Docket Item 331], 7.)

General warrants violate the Fourth Amendment because they authorize "a general, exploratory rummaging in a person's belongings." Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971). For a warrant to be invalidated as general, it must "vest the executing officers with unbridled discretion to conduct an exploratory rummaging through [defendant's] papers in search of criminal evidence." United States v. Christine, 687 F.2d 749, 753 (3d Cir. 1983). Whereas a regular wiretap involves tapping a particular phone, a roving wiretap "authorizes the government to, in effect, tap a person, 'intercept[ing] any and all identified telephones used by that person.'" United States v. Shannon, 766 F.3d 346, 349 n.4 (3d Cir. 2014).

As a threshold matter, the Government's argument that Defendant Tutis's motion to suppress the wiretap evidence is actually a motion for reconsideration is not persuasive. A motion for reconsideration may be granted only if "(1) an intervening change in the controlling law has occurred; (2) evidence not previously available has become available; or (3) it is necessary to correct a clear error of law or prevent manifest injustice. Interfaith Community Organization v. Honeywell Int'l, Inc., 215 F.

Supp. 2d 482, 507 n. 12 (D.N.J. 2012). Tutis argues that these are "new motions based on separate and distinct grounds," and even if the Court construes it as a motion for reconsideration, Tutis has received additional discovery that was not available during his first set of pretrial motions. (Reply Br. [Docket Item 331], 4.) The Court agrees, as Tutis makes arguments based on evidence not previously available – notably, the line sheets and Friday reports describing wiretap updates from ACPO to Judge DeLury had not yet been provided to the Defendant. (Id. at 5.) As a result, the Court will proceed to the merits of the motion.

Tutis argues that the September 26, 2014 wiretap order was defective because state and federal law require the applicant to show that a defendant's purpose in switching phones was to thwart law enforcement. Tutis claims that he merely used multiple phones, not that he used one, terminated it, and moved on to another one. (Id. at 7.) As a result, he argues that Judge DeLury actually authorized a roving warrant that essentially permitted the tapping of multiple phones simultaneously even though the warrant identified only one target phone. In other words, the Government used a simple order as to one target phone to "simultaneously rummage" five at a time, 24 hours a day, seven days a week. (See Sept. 8, 2016 Oral Arg. Tr. 24:1-5). Tutis further argues that the simultaneous interception of more than one phone exceeds the scope of the original warrant. (Id. at 22:15-24).

20

Under federal law, applicants for a roving wiretap must show that "there is probable cause to believe that the person's actions could have the effect of thwarting interception from a specified facility." 18 U.S.C. § 2518 (11)(b)(ii). Under New Jersey law, which is a "stricter standard" than the federal law, the state must show that the target has a "purpose . . . to thwart interception by changing facilities." N.J.S.A. 2A:156A-9(g)(2)(b); see State v. Feliciano, 224 N.J. 351, 370 (2016) (explaining the distinction between the federal roving wiretap statute and the New Jersey statute).

Tutis argues that the Government's September 26, 2014 warrant only contains "boilerplate language" and "conclusory allegations" regarding Tutis's purpose to thwart a law enforcement investigation. (Def.'s Renewed Mot. [Docket Item 322], 11.) He argues that "the affidavit is required to show with specificity and particularity the facts upon which the affiant relies in order to show the specifically intended purpose of the target to thwart interception." (Id. at 11, n.4.) But Tutis omits portions of the September 26, 2014 Affidavit, which states:

> As set forth herein, this investigation has established that Toye Tutis is a prominent significant member of a narcotics distribution operation within the City of Somers Point and City of Atlantic City, New Jersey. Toye Tutis, during the investigation, has changed his prepaid wireless telephone facility number on three (3) occasions, and told [a confidential informant] that he, Toye Tutis, changes his

> phone number often, including the latest
> change to a [new number], the telephone
> facility number that [Detective Dorn had]
> probable cause to believe and do believe Toye
> Tutis is currently using in furtherance of the
> specific crimes.

(Ex. B., ¶ 13 to Gov't Opp'n.) This language is far from boilerplate and conclusory, as it explains that investigators already knew that Tutis was a significant member of the drug operation, that Tutis changed his number three times, and that a confidential informant said that his latest change was to the number that Tutis was currently using.

Tutis argues that the recent New Jersey Supreme Court case State v. Feliciano, 224 N.J. 351 (2016), supports his argument that Detective Dorn did not show that he had a "specific purpose to thwart interception" of law enforcement. (Def.'s Renewed Mot. [Docket Item 322], 10.) In that case, in order to track alleged participants in a large-scale heroin trafficking scheme in Camden, law enforcement applied for a series of roving wiretap orders. Feliciano, 224 N.J. at 357. In many of these applications, affiants noted that the defendants had "abruptly ceased" or "abandoned" a particular number and moved to another one. Id. at 359. The court proceeded to outline a series of new procedures that law enforcement must employ to avoid the constitutional questions regarding "continued interception of a newly identified phone, without court involvement, under the [New Jersey] roving wiretap

provision." Id. at 376. Tutis argues that "[u]nlike the officers in Feliciano, the wiretaps on each of the phones were kept active as the officers added additional phones to the tap;" as a result, the officers were allegedly "tapping all, or most of, the phones believed to be associated with Toye Tutis simultaneously." (Def.'s Renewed Mot. [Docket Item 322], 12.) Tutis argues that for a roving wiretap to pass muster under the U.S. and New Jersey Constitutions, "the affiant must make the required showing of the specific purpose to thwart interception of that phone by abandoning the use of that phone and switching to another," and this "simultaneous tapping" is an unconstitutional general warrant. (Id. at 10, 12) (emphasis added).

This Court finds that nothing in Feliciano, either explicitly or implicitly, supports Defendant's argument that the Government must have shown that Tutis had completely abandoned a prior phone and was only using a new phone. As the Government noted in its briefing, the Feliciano court did not apply its holding retroactively and it was decided after all of the wiretaps and surveillance had been conducted in this case. (Gov't Opp'n at 4 n.5.)[21] Thus, Defendant's reliance on Feliciano is misplaced, as

---

[21] The court in Feliciano also noted that it did "not fault the experienced, specially designated wiretap judge who oversaw this investigation for not anticipating today's ruling and expressly making [the] findings" the Court was now requiring to be made in roving wiretap cases. 224 N.J. at 377. As the Government noted in oral argument, there is no "requirement under the statute

Judge DeLury could not have anticipated the additional procedures regarding roving wiretaps over eighteen months before the _Feliciano_ decision was handed down, and even if he could, the case does not support Defendant's argument that the Government must show that a defendant completely abandoned a prior phone. Further, there was, in any event, probable cause to believe that Tutis had changed his phone three times and that his current number represented merely the latest change, as stated in the Dorn Affidavit, _supra_. This information from the Confidential Informant gave Judge DeLury a substantial basis to find probable cause that Tutis was in the habit of changing his cell phones often to avoid detection of his illegal activities. It is also a reasonable inference that one who is involved as a principal participant in drug dealing, who conducts drug business over the phones and who changes phones frequently is doing so for the purpose of avoiding detection. No one would announce that he is changing phones often to avoid detection of criminality and it would be illogical to erect such a requirement of proving this by direct evidence, rather than by reasonable inferences from reliable evidence as is the standard for showing probable cause.

---

authorizing roving wiretaps that a roving wiretap can only be used where there is a clear sequential dropping phones with no overlap." (9/8 O/A Tr. at 29: 17-20).

Finally, to support the argument that "simultaneous tapping" is a general warrant, Tutis relies on the 1986 U.S. Senate Report regarding the Electronic Communications Privacy Act, which noted that "[i]t would be improper to use this expanded specificity order to tap a series of telephones, intercept all conversations over such phones then minimize the conversations collected a result." (Id. at 12 (quoting S. Rep. No. 99-541, at 5, 31 (1986)).) But Tutis omits other language from the same Report, also quoted in Feliciano, that the roving wiretap provision is "necessary to cover circumstances under which law enforcement may not know, until shortly before the communication, which telephone line will be used by the person under surveillance." Feliciano, 224 N.J. at 373 (quoting S. Rep. No. 99-541 at 31). Defendant's argument regarding the Senate Report is therefore not persuasive to the Court. In sum, neither federal and state wiretap law nor caselaw interpreting it require law enforcement to avoid simultaneous tapping of the target's cell phones under a roving wiretap.

**B.  The Wiretap Order Was Not Obtained in Violation of Franks v. Delaware**

Tutis argues that there were misstatements and omissions in the wiretap application of September 26, 2014 that require suppression of any fruits, in violation of Franks v. Delaware, 438 U.S. 154 (1978). The Court denied Tutis' first request for a Franks hearing and fully explained its reasoning. See United States v.

<u>Tutis</u>, 167 F. Supp. 3d 683 (D.N.J. 2016). However, in light of the Government's October 6, 2016 disclosure and Defendant's October 10, 2016 letter, (<u>see</u> [Docket Items 361 and 368]), discussing the Government's recent disclosure that Jewell Tutis told CI #607/CS-2 that he was "Santana," not Toye Tutis, the Court convened a <u>Franks</u> hearing with regard to Detective Dorn's alleged misstatements in his September 26, 2014 application to Judge DeLury on October 17 and 19, 2016. (<u>See</u> <u>generally</u> 10/17/16 Tr. [Docket Item 413]; 10/19/16 Tr. [Docket Item 415].) During the <u>Franks</u> hearing, the Court received live testimony from Detective Dorn and from Defendant Tutis and received into evidence numerous pieces of documentary, audio, and video evidence. (<u>See</u> <u>generally</u> <u>id.</u>)

Defendant Tutis argues that Detective Dorn intentionally or recklessly made a number of false statements and material omissions in his affidavit submitted to Judge DeLury and that in the absence of those statements the affidavit does not contain sufficient probable cause to justify the issuance of the requested warrant. For the reasons outlined below, the Court finds Detective Dorn did not make any incorrect statements knowingly, intentionally, or with reckless disregard for the truth. Additionally, the Court finds that Detective Dorn's alleged false statements or omissions were not necessary to the finding of probable cause for the September 26, 2014 Wiretap Order and that there was a reasonable

basis for Detective Dorn's representation that CI #607/CS-2 was a "reliable" informant.

The Government opposes Defendant Tutis' motion, arguing that (1) the affidavit contains a more than sufficient reliable factual basis for probable cause, (2) Defendant Tutis fails to consider the affidavit in its entirety, ignoring detailed allegations, (3) a drug trafficking conspirator does not have to make sales to be liable for conspiracy, (4) a two month gap between one recorded call and the application for a wiretap does not undermine probable cause, (5) the misspelling of Jewell Tutis' name on the business card is not dispositive, (6) the omission of additional possible facts does not undermine probable cause, (7) CI #607/CS-2, Detective Dorn, and other investigators were familiar with Toye Tutis' voice, (8) the lack of other evidence regarding the code name "Santana" is not significant, (9) the fact Defendant Tutis was not intercepted speaking explicitly about drugs does not undermine probable cause, and (10) Judge DeLury could consider Detective Dorn's experience and conclusions he drew from the evidence in finding probable cause. (See Gov't First Opp'n at 35-51.) Additionally, the Government argues that Defendant Tutis' claims regarding allegedly false assertions in the affidavit are meritless and that suppression is unwarranted where the Government relied in good faith on Judge DeLury's Wiretap Order. (Id. at 52-59.)

1. <u>Alleged Incorrect Statements and Omissions Were Not Made Knowingly and Intentionally, or With Reckless Disregard for the Truth</u>

At the close of the <u>Franks</u> hearing, after both Detective Dorn and Defendant Tutis testified and after the Court accepted into evidence a number of documents, audio recordings, and video recordings regarding the statements made in Detective Dorn's affidavit, counsel for Defendant Tutis identified the alleged incorrect statements or omissions therein which Defendant Tutis contends justify relief under <u>Franks</u>. (<u>See</u> 10/19/16 Tr. [Docket Item 416], 66:9-80:20.) These are:

- Detective Dorn allegedly failed to acknowledge that the eighteen-month-long federal investigation into Defendant Tutis had not gathered any incriminating evidence against him at the time Detective Dorn applied for the wiretap with Judge DeLury.
- Detective Dorn knew or should have known that Jewell Tutis, and not Defendant Tutis went by the nickname "Santana."
- Detective Dorn should have informed Judge DeLury that the video of the confidential drug purchase at Dave's Grocery contradicts CI #607/CS-2's version of events.

(<u>See</u> <u>id.</u>)

Additionally, counsel for Defendant Tutis offered a number of arguments in attempting to undermine Detective Dorn's credibility. (<u>See</u> 10/19/16 Tr. [Docket Item 416], 69:22-78:3.) These are:

- The claim that the federal investigation did not gather any evidence against Defendant Tutis for eighteen months, but that he then engaged in explicit discussions of criminal behavior with CI #607/CS-2, a known informant, is not believable.
- The claim that Detective Dorn's investigation could not afford to set up a controlled purchase of a kilogram of

cocaine, in order to come into direct contact with Defendant Tutis, is not believable.

(See id.)

The Court shall first evaluate Detective Dorn's credibility as a witness and then address the alleged false statements or material omissions.

a.    Detective Dorn's credibility.

The Court had ample opportunity to observe Detective Dorn's demeanor and assess his credibility as he testified and was cross-examined at the Franks hearing. Defendant Tutis first attempts to impeach Detective Dorn's credibility by arguing that it is not believable that Defendant Tutis would engage in incriminating behavior in the vicinity of CI #607/CS-2, because Defendant Tutis already knew that CI #607/CS-2 had operated as an informant in the past. (See 10/19/16 Tr. [Docket Item 416], 69:22-70:7.) However, as the Court noted on the record during the Franks hearing, there is significant evidence, described in Detective Dorn's affidavit and supported by documentary evidence received during the Franks hearing that Jewell Tutis was uninhibited regarding discussions of criminal behavior in the presence of and the sale of drugs to CI #607/CS-2 during this time. (See id. at 70:8-23.) That calls into question whether the Tutises knew of CI #607/CS-2's previous or contemporaneous status as an informant and whether knowledge of such status would have impacted the Tutises' behavior toward CI

#607/CS-2.[22] Therefore, the Court does not find this theory to be a basis for discounting Detective Dorn's testimony.

Defendant Tutis further asserts that Detective Dorn's claim that the ACPO investigation could not afford a confidential purchase of a kilogram of cocaine is not believable. (See id. at 77:13-78:3.) However, Detective Dorn credibly testified repeatedly during the Franks hearing that the purchase of a kilogram of cocaine would have cost the investigation approximately $30,000 and that while investigators may be able to secure that level of funding to support a number of confidential purchases, it would have been unrealistic for the ACPO to have secured that much money in order to set up a single transaction. (See, e.g., id. at 141:4-146:2.) Counsel for Defendant Tutis intimated that ACPO's federal partners may have had access to greater sums of money, and pointed out that the ACPO's overall budget for this investigation was over $30,000, but did not provide any credible evidence or persuasive argument that it would have been possible for the ACPO investigation to have secured the funds necessary to purchase a

---

[22] Additionally, Defendant Tutis testified at the Franks hearing that he knew of CI #607/CS-2's reputation in the community as an informant, and that he had been familiar with CI #607/CS-2 since the 1990's, but that he had never personally met with or spoke to CI #607/CS-2 on or before July 15, 2014. (See id. at 7:12-8:21.) However, the inquiry at a Franks hearing is into the state of mind of the affiant, in this case: Detective Dorn. Defendant Tutis did not provide any testimony regarding Detective Dorn's state of mind, therefore Defendant Tutis' testimony is not directly relevant to this inquiry.

kilogram of cocaine. (See generally id.) Therefore, the Court does not find this to be a basis for discounting Detective Dorn's testimony.

Detective Dorn testified that at the time he signed his affidavit, he believed all the statements contained therein to be truthful and accurate, including the information provided to him by CI #607/CS-2. (See 10/17/16 Tr. [Docket Item 414], 177:13-20.) Detective Dorn's testimony at the Franks hearing was clear, internally consistent, and consistent with the documentary record. The Court finds he was credible in all material respects. The Court rejects Defendant Tutis' arguments attempting to impeach Detective Dorn's credibility and finds Detective Dorn's testimony to be highly credible and worthy of significant weight.

b.    Omitting mention of the federal investigation.

Defendant Tutis asserts that Detective Dorn should have mentioned in his affidavit that the parallel federal investigation of Defendant Tutis had not produced any incriminating evidence against him, and that failing to do so constitutes a material omission. (See 10/19/16 Tr. [Docket Item 416], 67:3-14.) As an initial matter, Defendant Tutis has not provided any evidence that this premise is true; there was no evidence entered into the record to establish that prior to Detective Dorn signing his affidavit that a federal investigation into Defendant Tutis and been ongoing for eighteen months, that the investigation had not uncovered any

incriminating evidence against Defendant Tutis, and that Detective Dorn knew this to be the case. However, even if such evidence had been placed on the record, Defendant Tutis has not directed the Court's attention to any legal authority to support the proposition that the inability of a federal investigation to uncover incriminating evidence against a particular target impacts the legal standard for a state investigation into that same target to show probable cause for a search warrant, when such warrant application is based solely on information gathered by that state investigation.

In this case, Detective Dorn's affidavit explicitly states that no information from the federal investigation was used in preparing the affidavit. (See Dorn Aff. at ¶ 11.) Defendant Tutis does not claim that Detective Dorn was aware of exculpatory information collected by the federal investigation, only that Detective Dorn should have informed Judge DeLury that the federal investigation into Defendant Tutis had been thus far fruitless. Defendant Tutis does not explain why this should impact Judge DeLury's probable cause analysis. The Court has no reason to conclude that a federal investigation's lack of evidence would somehow prevent or preclude a state investigation from successfully uncovering evidence by different means. The Court also has no evidence presently before it that the federal

investigation into Defendant Tutis actually was fruitless at the time Detective Dorn signed his affidavit.

          c.     Stating that "Santana" was a nickname used by Defendant Tutis.

Defendant Tutis further asserts that Detective Dorn knowingly, intentionally, or recklessly stated incorrectly in his affidavit that "Santana" was a nickname used by Defendant Tutis. Defendant Tutis argues that Detective Dorn knew or should have known that the nickname "Santana" was used to refer to Jewell Tutis, not Defendant Tutis. (See 10/19/16 Tr. [Docket Item 415], 68:12-69:21.) In support of this argument, Defendant Tutis introduced into evidence copies of phone calls captured by the ACPO's investigation wherein Jewell Tutis referred to himself as "Santana" and "little Santana." (See 10/17/16 Tr. [Docket Item 413], 104:17-113:7.)

In his testimony at the Franks hearing, Detective Dorn testified that CI #607/CS-2 told him that Defendant Tutis had given CI #607/CS-2 a business card containing two names and telephone numbers: "Jewel [sic] (609) 626-4684" and "Santana (609) 431-2044." (See id. at 55:9-20.) Detective Dorn also testified that the two separate names implied to him that there were two separate people and that CI #607/CS-2 told him that "Santana" referred to Defendant Tutis. (See id.) As described, supra, when Detective Dorn witnessed CI #607/CS-2 call the number associated with

"Santana" on the business card, he recognized Defendant Tutis as the individual who answered and responded to the name "Santana."

Detective Dorn admitted that he knew prior to signing his affidavit that Jewell Tutis had sometimes referred to himself as "Santana" or "little Santana," but that he did not include that information in the affidavit because he thought that the term "Santana" may have generally referred to the whole Tutis drug ring, or that the term "little Santana" referred to Jewell Tutis, while Defendant Tutis may have been called "big Santana." (See id. at 80:11-82:4, 104:17-113:7.)[23]

Defendant Tutis emphasizes that Detective Dorn later filed a report, dated February 18, 2016 but based on an interview he had with CI #607/CS-2 on February 10, 2016, which contains inconsistencies relative to Detective Dorn's affidavit in support of the September 26, 2016 Wiretap Order. (See, e.g., 10/17/16 Tr. [Docket Item 414], 95:13-97:5, 129:24-131:19.) Specifically,

_____

[23] Defendant Tutis also raises the issue of a conversation between CI #607/CS-2 and Jewell Tutis wherein Jewell Tutis tells CI #607/CS-2 to contact a person named "Casper" in order to buy bus passes. (See 10/17/16 Tr. [Docket Item 413], 110:10-113:7.) Defendant Tutis asserts that because Jewell Tutis tells CI #607/CS-2 to identify him/herself to "Casper" as "Santana's cousin," that Jewell Tutis must be "Santana." (See id.) Detective Dorn testified that he found the conversation confusing but believed that the conversation may rather indicate that Jewell Tutis is not "Santana," because if he were, then in this conversation he would be referring to himself in the third-person. (See id.) The Court finds that the meaning of this particular conversation is unclear and therefore cannot say that it should have put Detective Dorn on notice regarding the identity of "Santana."

Detective Dorn testified that his February 18, 2016 report contains two inaccuracies: (1) the February 18, 2016 report states CI #607/CS-2 received a business card on July 25, 2014; however CI #607/CS-2 actually received it on August 4, 2014 and gave it to Detective Dorn on August 5, 2014; (2) the February 18, 2016 report states CI #607/CS-2 received that business card from Jewell Tutis, however, CI #607/CS-2 actually received the card from Defendant Tutis. (See 10/17/2019 Tr. [Docket Item 414], 84:12-85:19.) Defendant Tutis argues that the February 18, 2018 report is the more accurate document and that Detective Dorn's original affidavit was incorrect. However, Detective Dorn testified at length, and very credibly, that the errors were made in the February 18, 2018 report, and that the errors were the result of his own carelessness.

Additionally, the October 6, 2016 letter from the Government to counsel for Defendant Tutis indicated that, in the course of a trial preparation meeting on October 4, 2016, CI #607/CS-2 revealed that later on in the ACPO investigation into the Tutises, Jewell Tutis indicated to CI #607/CS-2 that he was the person who went by "Santana." (See id. at 77:25-80:10.) Detective Dorn testified that the October 4, 2016 meeting was the first time that he learned of this information. (See id.) Detective Dorn also testified that, during that meeting, CI #607/CS-2 clarified that he had been given the business card by Defendant Tutis who told CI #607/CS-2 the

extra names and numbers to write on it. (<u>See</u> <u>id.</u>) Detective Dorn indicated that this narrative of events was consistent with CI #607/CS-2's prior descriptions of the origins of the business card. (<u>See</u> <u>id.</u>)

While evidence has been presented that Detective Dorn had seen evidence that Jewell sometimes referred to himself as "Santana" or "little Santana" prior to signing the affidavit,[24] the Court credits Detective Dorn's testimony that he believed that the nickname referred primarily to Defendant Tutis, but that it may at other times have been used by Jewell Tutis or used as shorthand for the entire drug ring. The Court does not find that Detective Dorn knowingly, intentionally, or recklessly misstated or omitted facts related to the identity of "Santana."

       d.    The drug purchase at Dave's by Ta'Ja.

Defendant Tutis also asserts that Detective Dorn knowingly, intentionally, or recklessly stated incorrectly in his affidavit that Defendant Tutus was present when CI #607/CS-2 made a confidential drug purchase from Jewell Tutis at the grocery store

---

[24] Defendant Tutis also testified that he never went by the nickname "Santana," (<u>see</u> 10/19/16 Tr. [Docket Item 416], 59:15-21), however the inquiry at a Franks hearing is focused on the state of mind of the affiant, in this case: Detective Dorn. Therefore the question before the Court is whether or not Detective Dorn acted knowingly, intentionally, or recklessly in falsely stating in his affidavit that Defendant Tutis went by the nickname "Santana." The inquiry is not whether or not Defendant Tutis actually went by the nickname "Santana."

owned by Defendant Tutis: Dave's by Ta'Ja. Defendant Tutis argues that Detective Dorn knew or should have known that Defendant Tutis was not present at this event. (See 10/19/16 Tr. [Docket Item 415], 70:14-76:21.) The parties appear to agree that the portion of Detective Dorn's affidavit describing this event accurately reflects what was contained in CI #607/CS-2 debriefing, and the issue remaining for the Court to determine is whether CI #607/CS-2 made an incorrect statement during the debriefing that Detective Dorn should have corrected in his affidavit by reference to the video recording of the event made by way of a body camera placed on CI #607/CS-2. (See id. at 73:8-74:11.)

Defendant Tutis argues that the video establishes that he was not present during the event,[25] rather that CI #607/CS-2 saw Defendant Tutis' brother Joseph in the store and confused the two. (See id. at 60:15-61:13, 70:14-76:21.) However, as the Court described on the record during the Franks hearing, the video of this event is "totally unclear"[26] and displayed upside down, and

---

[25] There is evidence on the record that, contrary to CI #607/CS-2's debriefing statements, Jewell Tutis may have been the one to offer CI #607/CS-2 a free cup of coffee, rather than Defendant Tutis offering CI #607/CS-2 something free from the store, however Defendant Tutis never explained the materiality of this confusion beyond the mere evidence of Defendant Tutis' presence in the store at the time of the confidential drug purchase.

[26] The Court notes that the images in the video are so difficult to discern, that it appears from the record that counsel for Defendant Tutis initially thought that one individual had a distinctive hairstyle and later in the hearing determined that the

the audio quality is similarly compromised, being obscured by background conversations and music. (10/17/16 Tr. [Docket Item 414], 167:12-171:4; see also 10/19/16 Tr. [Docket Item 416], 61:11-23.) Additionally, the camera and microphone are up against a wall for a significant portion of the relevant clip, therefore negating any value in potential visual identification and hampering the ability of the microphone to pick up the conversations taking place in the store. Therefore, there is not of much value in using this video to corroborate or challenge CI #607/CS-2's version of events.

Furthermore, Detective Dorn's affidavit clearly states that he was relaying information provided to him by CI #607/CS-2, rather than independently verifying claims made by CI #607/CS-2. (See Dorn Aff. at ¶ 44.) As the parties appear to agree that Detective Dorn's summation of CI #607/CS-2's debriefing is accurate, and as the video that Defendant Tutis seeks to use to undermine CI #607/CS-2's debriefing statements is of too low of quality to definitively determine the accuracy of CI #607/CS-2's debriefing statements, the Court does not find that Detective Dorn knowingly, intentionally, or recklessly misstated or omitted facts related to

---

individual was actually wearing a hat. (See 10/17/16 Tr. [Docket Item 414], 167:12-171:4.)

Defendant Tutis' alleged presence during CI #607/CS-2's drug purchase at Dave's by Ta'Ja.[27]

> 2. Detective Dorn's Alleged False Statements or Omissions Were Not Necessary to the Finding of Probable Cause for the September 26, 2014 Wiretap Order

Defendant Tutis has specifically requested that the Court excise Paragraphs 19, 21, 23, and 44 from Detective Dorn's affidavit in support of the September 26, 2014 Wiretap Order. (See 10/19/16 Tr. [Docket Item 416], 66:9-82:2.) For the reasons stated above, the Court shall deny this request. However, even if the Court were to find that those paragraphs contained incorrect statements that were made knowingly, intentionally, or recklessly, and that those paragraphs should therefore be excised from Detective Dorn's affidavit, the remainder of the affidavit contains sufficient averments to establish probable cause for the issuance of the Wiretap Order.

As stated, supra, a finding of probable cause requires a "'fair probability'" of criminal activity, based upon the totality

---

[27] Defendant Tutis testified in some detail that he would never wear an orange shirt or hat like the individual in the video; however, the inquiry at a Franks hearing is focused on the state of mind of the affiant, in this case Detective Dorn. Therefore, the question before the Court is whether or not Detective Dorn acted knowingly, intentionally, or recklessly and falsely stated in his affidavit that CI #607/CS-2 told him that Defendant Tutis was present during the confidential drug purchase at Dave's by Ta'Ja. The inquiry is not whether or not Defendant Tutis actually was present during the confidential drug purchase at Dave's by Ta'Ja.

of the circumstances. Bond, 581 F.3d at 139 (quoting Gates, 462 U.S. at 238). In this instance, once the paragraphs identified above have been extracted from Detective Dorn's affidavit, what remains are the following assertions regarding Defendant Tutis and the phone number in question, (424) 646-1761, summarized below:

- Defendant Tutis is a prominent member of a narcotics distribution operation in and around Atlantic City, New Jersey. Defendant Tutis changed his phone number on three (3) occasions and that he changed his phone number often, in a deliberate effort to thwart detection by law enforcement. (See Dorn Aff. at ¶ 13.)
- Defendant Tutis held himself out as a legitimate businessperson, meanwhile he was a "a multi-kilogram distributor of cocaine, and the leader of a large narcotics trafficking network." (Id. at ¶ 20.)
- Jewell Tutis told CI #607/CS-2 that he worked under his brother Defendant Tutis and that they trafficked in narcotics and in weapons. (Id. at ¶ 22.)
- Between August 6 and September 23, 2014, CI #607/CS-2 coordinated and engaged in numerous drug purchases from Jewell Tutis, often using the code language communicated to him by Defendant Tutis and often occurring at the apartment complex where Defendant Tutis' company was contracted to do maintenance. (Id. at ¶¶ 24-52.)
- Jewell Tutis told CI #607/CS-2 that he and Defendant Tutis are able to obtain and sell fraudulent driver's licenses from any state and CI #607/CS-2 had a fraudulent Georgia driver's license made for himself. (Id. at ¶¶ 40, 53.)
- Numerous conversations were recorded between a phone number that was the subject of a separate wiretap on Jewell Tutis and the target number in this application, (424) 646-1761, regarding the trafficking of fraudulent driver's licenses. Investigators believed that the individual using (424) 646-1761 was Defendant Tutis, Jewell Tutis' brother, who they identified by the character of his voice and the vocabulary that he used, including references to their "mom" and references to "the mat," which investigators took to refer to the Ta'Ja Laundromat owned by Defendant Tutis. (Id. at ¶ 54.)

- Through Detective Dorn's training and experience, he believed that the Tutises were utilizing the fraudulent driver's licenses to open post office boxes under false names that they could then use to deliver packages of narcotics. (Id.)

Based on the above averments, Detective Dorn's affidavit in support of obtaining the September 26, 2014 Wiretap Order continues to show that there is a "fair probability" that the target phone number, (424) 646-1761, was being utilized in the furtherance of the drug trafficking crimes that Detective Dorn was investigating at the time. The portions of Detective Dorn's affidavit described above show that Jewell Tutis had admitted to being in a drug and weapon trafficking ring with his brother, Defendant Tutis, that part of this criminal enterprise included the production of a fraudulent driver's license, which may have been utilized to facilitate the shipping of contraband, that Jewell Tutis discussed this aspect of the trafficking ring with the individual utilizing the target phone number, (424)646-1761, and the investigators determined that that individual was likely Defendant Tutis due to the character of his voice and the content of the conversations had with Jewell Tutis.

Therefore, probable cause for issuance of the September 26, 2014 Wiretap Order would clearly be present, even if the Court were to have determined that Paragraphs 19, 21, 23, and 44 from Detective Dorn's affidavit in support of the September 26, 2014 Wiretap Order should be excised, which it has not.

### 3. Detective Dorn's Representation that CI #607/CS-2 was "Reliable" had a Reasonable Basis

Additionally, Detective Dorn's affidavit describes CI #607/CS-2 as a "reliable confidential informant" in Paragraph 59C, though the affidavit does not articulate why Detective Dorn felt the informant to be "reliable." (Dorn Aff. at ¶ 59C.) Defendant Tutis argues that Detective Dorn should not have regarded CI #607/CS-2 as reliable because the informant was being paid, because there was insufficient evidence that Toye Tutis was on the phone during the August 5, 2014 call, because CI #607/CS-2 must have received the phone number 609-742-6335 from Jewell Tutis, because the affidavit lacks any information about CI #607/CS-2's prior reliability, and because the undercover purchases of drugs from Jewell Tutis do not corroborate CI #607/CS-2's information with respect to Toye Tutis. (See 10/19/16 Tr. [Docket Item 416], 67:15-68:4, 80:10-82:2.)

Detective Dorn credibly indicated during his testimony that he considered CI #607/CS-2 to be a reliable source in part due to his prior work as an informant with ACPO and due to his production of verified intelligence in this investigation. (See 10/17/16 Tr. [Docket Item 414], 86:11-93:18.) Such intelligence included providing investigators with code words used by members of the Tutis drug ring to conceal discussions of types and quantities of certain drugs offered for sale by the ring. (See id.) CI #607/CS-

2 also successfully coordinated certain controlled purchases of drugs as part of this investigation. (See id.) Additionally, Detective Dorn testified at length that he did not include more detail regarding CI #607/CS-2's reliability in the affidavit because he thought it could risk exposing CI #607/CS-2's confidential identity and that he was prepared to opine further on CI #607/CS-2's reliability had Judge DeLury asked him for such further information at the time. (See, e.g., id. at 137:9-140:3.)

The Court finds that Detective Dorn's testimony was highly credible and that his prior experiences with CI #607/CS-2, both in relation to this investigation and prior ones, were sufficient for Detective Dorn to indicate to Judge DeLury that he found CI #607/CS-2 to be a reliable source of information, and for him to rely on information provided by CI #607/CS-2 in crafting his affidavit.

For the foregoing reasons, the Court finds that the September 26, 2014 Wiretap Order was not obtained in violation of Franks v. Delaware, and therefore the evidence gained therefrom shall not be suppressed.

### C.    The Silver Platter Doctrine Does Not Apply

Finally, Tutis argues that the wiretap evidence should be suppressed because of the "silver platter" doctrine. Tutis argues that under N.J.S.A. 2A:156A-4, the application for a roving wiretap should have been approved by the Attorney General of New Jersey or

his designee, including a County Prosecutor, or under 18 U.S.C. § 2515, by the U.S. Attorney General. (Def.'s Renewed Mot. [Docket Item 322], 25-31.) Tutis claims that the decision to transfer the investigation to the state was an intentional attempt to make an end run around the federal statutory requirements. (Id.) Tutis further notes that it is "at least suspicious" that investigators chose to seek a wiretap order from Judge DeLury at the state level, instead of a federal judge. (Reply Br. [Docket Item 331], 14.)

As stated by the Honorable Judge Garrett E. Brown, Jr. in the case of In re Application of Telfair, 745 F. Supp. 2d 536 (D.N.J. 2010):

> The rationale of [Defendant Tutis' motion] based on the "silver platter doctrine" escapes this Court. Half-a-century ago, the Supreme Court adopted the term by ruling, in Elkins v. United States, 364 U.S. 206 (1960), that evidence obtained by state officers in violation of the Fourth Amendment could not be introduced against a defendant in a federal criminal trial. That position was a broadening of the holding reached in Weeks v. United States, 232 U.S. 383 (1914), where the Court held that evidence obtained by federal officials in violation of the Fourth Amendment cannot be used against a defendant in a federal criminal proceeding; that rule eventually became part of Fourth Amendment concepts and policies jointly comprising the exclusionary rule which, in turn, gives base to suppression motions. See, e.g., United States v. Crandell, 554 F.3d 79, 83 (3d Cir. 2009) (quoting Terry v. Ohio, 392 U.S. 1, 12 (1968), for clarification that the term "exclusionary rule" implicates, "[i]n the evidentiary context of the defendant's criminal trial, [a determination as to] the

> admissibility against a defendant of the
> evidence uncovered by the search and
> seizure"); <u>United States v. Berry</u>, 369 F.2d
> 386, 387 (3d Cir. 1966) ("[t]he ground for the
> motion to suppress [might be] the well
> established rule that evidence obtained as the
> result of an illegal arrest or search is
> inadmissible in a prosecution for a criminal
> offense").

<u>Telfair</u>, 745 F. Supp. 2d at 579 n.37.

As in <u>Telfair</u>, Defendant Tutis has failed to establish that the September 26, 2014 Wiretap Order was obtained in violation of the Fourth Amendment, and therefore he cannot state a claim under the "silver platter" doctrine. <u>See id.</u> Mere speculation of "rubber stamp[ing]" wiretap orders by judges and "forum shopping" by the Government without articulable facts supporting those allegations, (Reply Br. [Docket Item 331], 14-15), is insufficient to obtain suppression for an alleged Fourth Amendment violation. The Court therefore denies Defendant's motion to suppress based on the "silver platter" doctrine.

## V.   **CONCLUSION**

For the foregoing reasons, "Defendant Toye Tutis' motion to suppress evidence intercepted as a result of the September 26, 2014 Wiretap Order" has been denied, along with Defendant Tutis' requests to suppress evidence obtained by electronic surveillance and/or consensual electronic interceptions of Ivan Cuellar Naranjo where communications involved Defendant Toye Tutis and Defendant Tutis' motion to suppress evidence intercepted as a result of the

ACPO's alleged use of a special technology "which transforms an ordinary cell phone into a bug." The accompanying Order shall be entered.


**May 23, 2019**                                   **s/ Jerome B. Simandle**
Date                                                JEROME B. SIMANDLE
                                                    U.S. District Judge